**UNITED STATES DISTRCT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**PROFESSIONAL INVESTIGATING**
**AND CONSULTING AGENCY, INC.**
**D/B/A PICA CORPORATION,**

|  |  |
|---|---|
| **Plaintiff,** | **Case No. 2:19-cv-03304-ALM-KAJ** |
| **-vs-** | **Judge Algenon L. Marbley** |
| **SOS SECURITY LLC, et al.** | **Mag. Judge Kimberly A. Jolson** |
| **Defendants.** |  |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT RODOLFO G.**
**DIAZ'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, FOR TRANSFER OF**
**VENUE, AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Plaintiff Professional Investigating and Consulting Agency, Inc. d/b/a PICA Corporation (hereinafter "PICA"), by and through counsel, hereby submits the following memorandum in opposition to the Motion to Dismiss for Lack of Personal Jurisdiction, and in the alternative, for Transfer of Venue, and Motion to Dismiss for Failure to State a Claim (ECF #8) filed on behalf of Defendant Rodolfo G. Diaz (hereinafter "Diaz") on August 20, 2019. For the reasons set forth in the accompanying memorandum in opposition, Defendant's motion should be overruled.

In addition, in the event the Court determines that any of the three claims asserted against Defendant Diaz are preempted by OUTSA, Plaintiff respectfully requests that the Court grant it leave to amend its complaint to assert a claim for misappropriation of trade secrets based on the OUTSA against Defendant Diaz.

Respectfully submitted,

/s/Daniel N. Abraham

Daniel N. Abraham (0023457)
David I. Shroyer (0024099)
**Colley Shroyer & Abraham Co., LPA**
536 South High Street
Columbus, Ohio 43215
T: (614) 228-6453
F: (614) 228-7122
Email: dabraham@csajustice.com
dshroyer@csajustice.com
*Trial Counsel for Plaintiffs*

## MEMORANDUM IN OPPOSITION

### I.  Introduction

The gravamen of PICA's case is that SOS Security LLC (hereinafter "SOS"), by way of a conspiracy between PICA's former Chief Operating Officer, Diaz, and SOS's Chief Executive Officer, Edward B. Silverman (hereinafter "Silverman"), and others, used the purported acquisition of PICA by SOS to steal its know-how, employees, vendors, clients, means and methods, and other confidential and proprietary information, as well as to interfere with PICA's advantageous business relationships.

On June 27, 2019, Plaintiff PICA filed its complaint in Franklin County Common Pleas Court asserting claims against SOS, Diaz, and Silverman. PICA has asserted claims against Diaz based on conspiracy to commit fraud (Count III), breach of fiduciary duty/violation of R.C. 1701.641 (Count IV), and conspiracy to tortiously interfere with business relationships (Count VIII). On July 30, 2019, Defendants filed a Notice of Removal pursuant to 28 U.S.C. §1446(a) based on diversity. (ECF #1) On August 6, 2019, the Court granted Defendants an extension of time until August 20th in which to respond to Plaintiff's complaint. (ECF #5) On August 20, 2019,

Defendants filed their motions to dismiss challenging personal jurisdiction over the individual Defendants Diaz and Silverman and arguing that Plaintiff's complaint fails to state a claim upon which relief can be granted. (ECF #7 and ECF #8)

## II.    Statement of Relevant Facts

PICA is a privately-held Ohio corporation which operated a business providing security investigating and consulting services and executive protection and secure transport services for its customers. SOS also provided contract security-related services and was one of PICA's customers. (Complaint, ECF #2, ¶¶ 1, 12-13) Although SOS was a successful company, it did not have an investigating and consulting capability or executive protection and secure transport services. (Id. ¶ 12) PICA provided investigating and consulting services, executive and secure transport services, and support to SOS. SOS had no capability in South America for investigative and consulting services and had used PICA to fill this need. (Id. ¶ 13)

In an effort to obtain an investigating and consulting and executive protection and secure transport services capability, on or about October 2014, Silverman, SOS's Chief Executive Officer, approached Diaz, a PICA 5% Shareholder and its Chief Operating Officer, to discuss establishing a closer business relationship between the two companies with the purported goal of SOS purchasing PICA ("SOS' PICA Acquisition Process"). (Id. ¶ 14) PICA's other Shareholders, including Vincent Volpi (PICA's Chief Executive Officer and the majority shareholder of the company, who knew and had known Silverman for some years), were initially reluctant to engage in SOS' PICA Acquisition Process, particularly considering other offers and opportunities pending. However, Diaz persuaded them that it was in their best interests, as well as PICA's best interests, for PICA to form a closer business relationship with SOS and for PICA to ultimately be sold to SOS. PICA Shareholder, David Houze, an Ohio resident, was also brought into SOS' PICA

3

Acquisition Process and participated from Ohio by teleconference on calls with SOS as a shareholder. (Id. ¶ 15)

As part of SOS' PICA Acquisition Process, SOS requested that PICA disclose to SOS certain confidential information and trade secrets. Vincent Volpi and Vaughn Volpi (PICA's Chief Strategy Officer) had concerns about doing so, but Silverman assured them that SOS would keep this information secret and would not use it for any purpose other than in carrying out SOS' PICA Acquisition Process. (Id. ¶ 16) Diaz also allayed the Volpis' concerns, re-assuring them that SOS would not use PICA's confidential information and trade secrets for any competitive or other improper purpose. (Id. ¶ 17)

In reliance upon Silverman's and Diaz's representations in this regard, on or about December 1, 2014, PICA and SOS entered into a Confidentiality and Non-Disclosure Agreement (the "NDA"). (Id. Ex. 1) Pursuant to the NDA, from on or about December, 2014 through April, 2015, SOS requested, and PICA disclosed to SOS, PICA's confidential information and trade secrets including, but not limited to: (i) PICA's customers and potential customers; (ii) PICA's vendors and resources; (iii) the services PICA provided to its customers and proposed to provide to potential customers and PICA's know-how related to services, sales, marketing and opportunities pending; (iv) the rates that PICA charged its customers and proposed to charge potential customers; (v) the personnel PICA used to provide its services to customers and the rates PICA paid those personnel; and (vi) PICA's general and administrative overhead expenses, including full financial statements and revenues and margins per client for a five (5) year period. (Id. ¶ 18)

Unbeknownst to PICA at the time, Diaz and Silverman had previously agreed to work together to steal PICA's customers and trade secrets, to include its means and methods, for SOS.

4

Diaz continued to provide input and advice on the acquisition by SOS and, in fact, advised other shareholders to hold out for more money and better terms in an email dated April 12, 2015. On May 1, 2015, before the completion of SOS' PICA Acquisition Process, which was pushed by Diaz, but after SOS had obtained PICA's confidential information and trade secrets and a Letter of Intent ("LOI") had been negotiated, Diaz abruptly resigned from PICA. Diaz's last day of work at PICA was May 31, 2015. (Id. ¶ 19) Silverman claimed to have first become aware of Diaz's departure in a scheduled conference call with him and Ken Fisher, SOS CFO, as early as on or about May 6, 2015. SOS advised PICA that Diaz's resignation would have no bearing on the execution of the SOS/PICA LOI. However, at the Spring Meeting of the Latin America Regional Council on or about May 20, 2015, Silverman told Vincent Volpi that SOS was putting SOS' PICA Acquisition Process "on hold until the end of the year," while repeatedly stating that "the decision had nothing to do with the departure of Rudy [Diaz]." Silverman encouraged PICA to continue working with SOS with the idea that the SOS' PICA Acquisition Process was merely postponed, while SOS focused on opportunities with PICA in Mexico, Colombia, Venezuela, and Brazil. (Id. ¶ 20)

SOS continued to work with PICA for projects in Mexico, Colombia, Venezuela, and Brazil that same year, and directly interacted with PICA employees, such as Olavo Sant'Anna, in a July, 2015 meeting in Brazil, to put together proposals for a variety of clients, to include those SOS was representing for the 2016 Olympics. Following the July meeting with Andrew Silverman in Brazil, Sant'Anna became increasingly closer to SOS and started to distance himself from PICA and cause issues for PICA related to pricing and services, especially with SOS. This ultimately led to Sant'Anna's departure from the company and unfair competition by Sant'Anna in Brazil, including the solicitation of PICA's clients and personnel. (Id. ¶ 21)

5

Additionally, Vincent Volpi personally drafted plans and organized the business models to service many of SOS' clients, as well as the pricing and Operational Plan for the 2016 Olympics. Most of this was done with Silverman's son, Andrew Silverman, who was established as Vincent Volpi's primary point of contact with SOS and whom Silverman directed Vincent Volpi to mentor. The vast majority of the work proposed with PICA was never done, e.g. PICA had no role in SOS' servicing of clients in the massive 2016 Statement of Work, which PICA put together for the 2016 Olympics. (Id. ¶ 22)

PICA also provided SOS with VIP treatment at the Latin America Regional Council Meeting with ISMA in Bogota in August of 2015, introducing SOS to PICA's clients and contacts there, in the context of continued demonstration and due diligence of PICA's capabilities and profile within Latin America. Vincent Volpi also personally shepherded Andrew Silverman through Colombia and various meetings with PICA's clients in October, 2015 and meetings with contacts and officials there, with the idea of expanding SOS' business in Colombia. (Id. ¶ 23)

PICA also performed work for Microsoft, a client shared by both SOS and PICA, recovering stolen high-tech products for it on a project generally thought to be impossible to perform, but which PICA was able to execute flawlessly, resulting in the recovery of all products, IP and the arrest of the offenders. SOS ultimately claimed credit with the client for this work and defamed and diminished PICA to the client, damaging PICA's relationship with the client. (Id. ¶ 24) Finally, PICA referred Requests for Proposal to SOS for security guarding services, all in furtherance of SOS' PICA Acquisition Process, while PICA received no benefit in return. (Id. ¶ 25)

Upon information and belief, utilizing the confidential information SOS obtained from PICA under the pretext of SOS' PICA Acquisition Process, and with the collaboration of PICA's COO, Diaz, both before and after Diaz went to work for Global Foundries, a company that it was

6

later reported had been serviced by Diaz during his employment with PICA but which had not been managed or billed through PICA, in violation of Diaz' employment agreement, SOS violated the NDA, improperly utilizing PICA's confidential information and trade secrets to gain an unfair competitive advantage against PICA in the marketplace, establishing an unfairly advantageous relationship with Diaz, in violation of Diaz's fiduciary duties as PICA COO and his restrictive covenants with the company. (Id. ¶ 26) Completing its scheme to steal PICA's customers, and unfairly enhance their competitive edge against PICA, on June 1, 2017, exactly two years to the date of the expiration of Diaz's covenants not to compete with or solicit PICA employees or associates, SOS hired Diaz as its Vice President of Southeast Operations and Latin America. (Id. ¶ 27) Two weeks later, on or about June 14, 2017, SOS announced the acquisition of AS Solutions, a firm specializing in executive protection and secure transport and a former partner of PICA (introduced to Diaz), which has since expanded into investigations and consulting, intelligence, retail and loss prevention, and "other specialized services." AS Solutions has a large footprint in Silicon Valley, where Global Foundries is based. (Id. ¶ 28)

## III.  Law and Argument

### A.  The Court Can Exercise Personal Jurisdiction Over Defendant Rodolfo G. Diaz.

Defendant Diaz has moved to dismiss Plaintiff's complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). A plaintiff responding to a Rule 12(b)(2) motion "bears the burden of establishing the existence of jurisdiction." *Red Mortg. Capital, LLC v. Shores, LLC*, No. 2:16-cv-678, 2017 U.S. Dist. LEXIS 49092, *8 (S.D. Ohio Mar. 31, 2017) (Smith, J.), quoting *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008), citing *Brunner v. Hampson*, 441 F.3d 457, 462 (6th Cir. 2006). If the Court decides the motion based on "written submissions and affidavits . . . rather than resolving the motion after an evidentiary

hearing or limited discovery, the burden on the plaintiff is 'relatively slight,'. . . and 'the plaintiff must make only a *prima facie* showing the personal jurisdiction exists in order to defeat dismissal.'" *Id.*, quoting *Air Prods. & Controls, Inc. v. Safetech Int'l. Inc.*, 503 F.3d 544, 549 (6th Cir. 2007), quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988); *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

In analyzing whether the plaintiff has established a *prima facie* case, "the pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh 'the controverting assertions of the party seeking dismissal.'" *Id.* at *9, quoting *Air Prods. & Controls*, 503 F.3d at 549, quoting *Theunissen*, 935 F.2d at 1459. If "the plaintiff's allegations of fact establish a *prima facie* case of personal jurisdiction, the inquiry ends; a court does not weigh controverting factual allegations of the defendant." *Id.*, quoting *Highway Commer. Servs., Inc. v. Zitis*, No. 07-cv-1252, 2008 U.S. Dist. LEXIS 32487, *2 (S.D. Ohio Apr. 21, 2008) (Holschuh, J.), citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996); *Serras v. First Tenn. Bank Nat'l Assoc.*, 875 F.2d 1212, 1214 (6th Cir. 1989).

### 1. Personal jurisdiction is governed by a forum selection clause in the NDA.

"Even if a district court would not otherwise have personal jurisdiction over an out-of-state defendant, it is well established that a party may waive the personal jurisdiction requirement." *Zitis* at *8, citing *Kennecorp Mortgage Brokers, Inc. v. Country Club Convalescent Hosp.*, 66 Ohio St.3d 17, 175, 610 N.E.2d 987 (1993). One way in which parties may consent to the jurisdiction of a particular court is through a valid forum selection clause. *Id.*, citing *Information Leasing Corp. v. King*, 155 Ohio App.3d 201, 2003-Ohio-5672, ¶ 15, 800 N.E.2d 73. A forum selection clause "represents the parties' agreement as to the most proper forum." *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63 (2013), quoting *Stewart Org., Inc. v. Ricolt Corp.*, 487 U.S. 22,

31 (1983). The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system. *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring). "[A] valid forum selection clause [should be] given controlling weight in all but the most exceptional cases." *Id.*

Plaintiff originally filed this action in Franklin County Common Pleas Court in accordance with the forum selection clause set forth in the NDA and Defendants removed the action to federal court based on diversity. (Complaint ECF #2, ¶ 6) The NDA at issue in this case provides in relevant part:

> This Agreement shall be governed by and interpreted in accordance with the laws of the State of Ohio, exclusive of its conflicts of law rules. Any and all disputes arising under this Agreement ***shall be litigated exclusively in the federal or state courts located in Franklin County, Ohio exclusive of any other courts and the parties hereto, by entering into this Agreement, agree and consent to jurisdiction in said courts***.

(Id., Ex. 1) (emphasis added) Both of the individual defendants are signatories to the NDA – Diaz on behalf of PICA and Silverman on behalf of SOS. Diaz does not challenge the validity of the forum selection clause. Instead, he argues that he is not a party to the NDA and is, therefore, not subject to its terms, including the forum selection clause.

"[A] non-signatory to a contract may be bound by a forum selection clause in that contract if the non-signatory is so sufficiently 'closely related' to the dispute that it is foreseeable that the party will be bound." *H.H. Franchising Sys. v. Brooker-Gardner*, No. 1:14-CV-651, 2015 U.S. Dist. LEXIS 94827, *8 (S.D. Ohio July 21, 2015), quoting *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1106 (6th Cir. 1997). "In determining whether a non-signatory is closely related to a contract, courts consider the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement." *Id.* at *9, quoting *Carlyle Inv. Mgmt. LLC*

*v. Moonmouth Co. SA*, 779 F.3d 214, 219 (3rd Cir. 2015).  *See also, Zitis* at *10 ("A non-party to a contract may be bound by a forum selection clause if the party is so closely related to the dispute that it is foreseeable that the party will be bound. For example, shareholders, officers, and directors of a corporation may be bound by a forum selection clause in a corporate contract.").

The primary consideration when determining whether Diaz should be bound by the forum selection clause in the NDA is whether Diaz should have reasonably foreseen that he might be required to appear in an Ohio court in the event of a breach of the NDA.

> [C]ourts considering this question of whether a non-signatory may be bound by a forum selection clause take a common sense, totality of the circumstances approach that essentially inquires into whether, in light of those circumstances, it is fair and reasonable to bind a non-party to the forum selection clause. . . . [T]his approach places emphasis on whether it should have been reasonably foreseeable to the non-signatory that situations might arise in which the non-signatory would become involved in the relevant contract dispute.

*Brooker-Gardner* at *9, quoting *Regions Bank v. Wyndham Hotel Mgmt., Inc.*, No. 3:09-1054, 2010 U.S. Dist. LEXIS 23371, **16-17 (M.D. Tenn. Mar. 12, 2010).

In an effort to avoid the impact of the forum selection clause, Diaz maintains that he "is not directly related to the NDA and the contractual dispute between the parties thereto." (Motion to Dismiss ECF #8, ¶ 38) Yet, he served as the Chief Operating Officer of PICA, an Ohio corporation which has its principal place of business in Franklin County, Ohio. (Complaint, ECF #2, ¶¶ 1, 14; Volpi Affidavit[1] ¶¶ 2, 3) He signed an employment agreement with PICA that also had a forum selection clause designating state and federal courts in Franklin County, Ohio as having jurisdiction over any disputes related to the employment agreement. (Volpi Aff. ¶ 7, Ex. 1-C) Diaz was the PICA executive first approached by SOS in connection with the SOS' PICA

---

[1] A true and accurate copy of the Affidavit of Vincent Volpi is attached as Exhibit 1.

Acquisition Process and he was the person who persuaded Vincent and Vaughn Volpi that it was in their best interests, as well as PICA's best interests, for PICA to form a closer business relationship with SOS and for PICA to ultimately be sold to SOS. (Complaint, ECF #2, ¶¶ 14, 15) Diaz also allayed the Volpis' concerns about disclosing to SOS PICA's confidential information and trade secrets and signed the NDA, that included the forum selection clause, on behalf of PICA. (Id. ¶ 17)

The forum selection clause was a negotiated term of the NDA. (Volpi Aff. ¶ 6) The original version of the NDA proffered to PICA was prepared by SOS and included a forum selection clause identifying Morris County, New Jersey as the forum having jurisdiction over disputes related to the NDA. (Id. ¶ 4, Ex. 1-A) Vincent and Vaughn Volpi objected to the original version of the NDA for the purpose of engaging in the SOS PICA Acquisition Process because of the New Jersey forum selection clause and PICA prepared its own NDA to govern the disclosure of confidential information and trade secrets. (Id. ¶ 5) The revised NDA, which was signed by Diaz and Silverman on December 1, 2014, is the version governing this dispute. In addition, Diaz was instrumental in the breach of the NDA by SOS and facilitated its acquisition of PICA's confidential information and trade secrets, knowing that SOS had no intention of actually acquiring PICA. (Complaint, ECF #2, ¶¶ 26-28) Given Diaz' role in facilitating the NDA and its breach, it would be unfair to allow him to now disavow any relationship to the dispute to avoid the impact of the forum selection clause and the jurisdiction of this Court.

"Where a court finds a forum selection clause to be dispositive of the question of personal jurisdiction, the court need not consider the petitioner's constitutional argument as to personal jurisdiction." *Red Mortg. Capital* at *10, quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589 (1991), citing *Ashwander v. TVA*, 297 U.S. 288, 347 (1936). "The requirement that a

11

court have personal jurisdiction 'is a waivable right' and '[t]he use of a forum selection clause is one way in which contracting parties may agree in advance to submit to the jurisdiction of a particular court.'" *Id.*, quoting *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006), citing generally, *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972). Diaz signed the NDA with the forum selection clause on behalf of PICA submitting to the jurisdiction of this Court.

> **B.** **This Court Has Jurisdiction Over Defendants Based On The Forum Selection Clause In The NDA And The Motion To Transfer Venue Should Be Overruled.**

Defendant Diaz has moved in the alternative to transfer venue to the Southern District of Florida pursuant to 28 U.S.C. §1404(a). As the moving party, Diaz has the burden of establishing the need for the transfer. *Red Mortg. Capital* at *23, citing *Kay v. Nat'l City Mortg. Co.*, 494 F. Supp.2d 845, 849-850 (S. D. Ohio 2007), citing *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp.2d 941, 945 (S.D. Ohio 2002) (Sargus, C.J.). "Transfer pursuant to §1404 must be 'to a *more* convenient forum, not to a forum likely to prove equally convenient or inconvenient.'" *Id.*, quoting *Van Deusen v. Barrack*, 376 U.S. 612, 645-646 (1964) (emphasis added); *see also Shanehchian v. Macy's, Inc.*, 251 F.R.D. 287, 292 (S.D. Ohio 2008) ("[Section] 1404 does not allow . . . for transfer if that transfer would only shift the inconvenience from one party to another.")

"In ruling on a motion to transfer under §1404(a), a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moses v. Bus. Card Exp., Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991), citing *Stewart*, 487 U.S. at 30. Defendant Diaz has identified some of those factors. However, "[t]he calculus changes [] when the parties' contract contains a valid forum selection

clause, which 'represents the parties' agreement as to the most proper forum.'" *Red Mortg. Capital* at *25, quoting *Atl. Marine Constr.* 134 S. Ct. at 579, quoting *Stewart*, 487 U.S. at 31. The Court, relying on the Supreme Court's analysis from *Atl. Marine Constr.* and *Stewart*, explained

> When the parties have agreed to a valid forum selection clause, courts "should not consider arguments about the parties' private interests," because "[w]hen parties agree to a forum selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." . . . As such, courts may only consider public-interest factors which "will rarely defeat a transfer motion." . . . This leads to the conclusion "that forum-selection clauses should control except in unusual cases" and "a valid forum-selection clause is given controlling weight in all but the most exceptional cases."

*Id.* (citations omitted).

In this case, where the NDA includes a valid forum selection clause, only the public interest factors should be considered. The forum selection clause also provides that Ohio law will govern this action and Plaintiff's complaint, as well as Defendants opposition, are premised on Ohio law. As such, this forum is intimately familiar with the governing law and is experienced in its application. While a district court in Florida would be capable of applying Ohio law, this factor would favor allowing this Court to hear the case. In addition, this Court has an interest in resolving a dispute that is premised, in part, on a violation of the Ohio Uniform Trade Secrets Act by an out-of-state corporation that adversely impacts an Ohio corporation and causes it to suffer damages.

**C.    PICA Has Stated Plausible Claims For Relief Against Diaz.**

**1.    PICA's Claims Against Diaz Are Not Entirely Preempted By The Ohio Uniform Trade Secrets Act.**

The Ohio Uniform Trade Secrets Act ("OUTSA") displaces conflicting tort, restitutionary, and other Ohio laws providing civil remedies for the misappropriation of a trade secret. Ohio Rev. Code §1333.67(A). However, it does not displace contractual remedies, whether or not based on

the misappropriation of a trade secret, or other civil remedies that are not based on the misappropriation of a trade secret. Ohio Rev. Code §1333.67(B). PICA has not asserted a claim based on a violation of OUTSA against Defendant Diaz.

"The test to determine whether a state law claim is displaced by OUTSA is to determine whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Stolle Mach. Co., LLC v. Ram Precision Indus.*, 605 Fed. Appx. 473, 485 (6th Cir. 2015), quoting *Thermodyn Corp. v. 3M Co.*, 593 F. Supp.2d 972, 989 (N.D. Ohio 2008), quoting *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp.2d 722, 730 (N.D. Ohio 1999). "Where the state-law claim has a factual basis independent from the facts establishing the OUTSA claim, 'the portion of the claim supported by an independent factual basis survives preemption.'" *Id.*, quoting *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp.2d 925, 940 (S.D. Ohio 2012), quoting *Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp.2d 912, 921 (N.D. Ohio 2011). The claims against Defendant Diaz have a factual basis independent from the facts Defendant claims are part and parcel of Plaintiff's OUSTA claim and are not preempted by OUTSA.

Count III of Plaintiff's complaint alleges a conspiracy to commit fraud against Defendants SOS, Silverman, and Diaz. Plaintiff alleges:

> 43. Defendant Diaz agreed and conspired with Defendants Silverman and SOS to assist Silverman and SOS, and did assist Silverman and SOS, in carrying out and perpetrating a fraud on PICA by, *inter alia*: (i) confirming, promoting and vouching for the purported validity and good faith of SOS and SOS' PICA Acquisition Process, including SOS' purported good faith interest in establishing a closer business relationship with, and purchasing, PICA; (ii) encouraging PICA to take all preliminary steps to sell itself to SOS (including, without limitation, signing the NDA and providing SOS with PICA's confidential information and trade secrets); and (iii) advising and assuring PICA that SOS would maintain inviolate PICA's confidential information and trade secrets, all of which Diaz and his co-conspirators knew was untrue.

14

> 44. On information and belief, Defendants Diaz and SOS continued to conspire together while Diaz was working with Global Foundries, with Diaz supporting SOS in the execution of unfair competition against PICA and maintaining a continuing business relationship with SOS, in violation of Diaz's contractual obligations not to compete, by continuing to disclose PICA trade secrets, know-how, resources, operational models and pricing to SOS. Diaz never hired PICA while he was employed by Global Foundries, claiming that he was barred from doing so by a corporate policy prohibiting him from any transaction with a company with which he had had a prior business relationship, or other potential conflict-of-interest, for a period of one year.

(Complaint ECF #2, ¶¶ 43-44) While these allegations include facts that would also support an OUTSA claim, the conspiracy to commit fraud extends beyond the misappropriation of trade secrets to Diaz' actions to encourage PICA to become involved in SOS' PICA Acquisition Process, knowing that SOS never intended to move forward with the acquisition. (Id. ¶ 43) Diaz also conspired with SOS while he was working with Global Foundries "by supporting SOS in the execution of unfair competition against PICA and maintaining a continuing business relationship with SOS, in violation of Diaz's contractual obligations not to compete." (Id. ¶ 44) To the extent the claim is premised on these facts, the claim is not preempted by OUTSA.

Count IV of Plaintiff's complaint asserts a claim of breach of fiduciary duty/violation of R.C. 1701.641 against Defendant Diaz. This claim is based in part on Diaz' role in facilitating SOS' acquisition of PICA's confidential information and trade secrets and would be preempted, to that extent, by OUTSA.

Count VIII of Plaintiff's complaint alleges a conspiracy to tortiously interfere with business relationships against Defendants SOS, Silverman, and Diaz. The conspiracy claim must be viewed in conjunction with Plaintiff's claim against SOS for tortious interference with business relationships in Count VII. In addition to the allegations related to PICA's confidential information and trade secrets, Plaintiff also alleges:

67.     SOS intentionally and unjustifiably interfered with PICA's advantageous business relationship with PICA's client Microsoft, and stole Microsoft's business away from PICA, by, *inter alia,* disparaging PICA and taking credit for PICA's work and diminishing PICA to the client, damaging PICA's relationship with Microsoft.

(Id. ¶ 67) To the extent the claim extends beyond the misappropriation of trade secrets, the claim is not preempted by OUTSA.

Finally, Plaintiff's claim for misappropriation of trade secrets is brought only against Defendant SOS. Plaintiff asserts three different claims against Defendant Diaz: conspiracy to commit fraud, breach of fiduciary duty/violation of Ohio Rev. Code §1701.641, and conspiracy to tortiously interfere with business relationships. In the event the Court determines that any of these three claims are preempted by OUTSA, Plaintiff respectfully requests that the Court grant it leave to amend its complaint to assert a claim for misappropriation of trade secrets based on the OUTSA against Defendant Diaz.

**2.      Plaintiff has stated a claim against Diaz based on conspiracy to commit fraud.**

Plaintiff's claim against Diaz based on conspiracy to commit fraud is based on conduct on the part of Diaz that induced PICA to enter into the NDA with SOS.

To prove fraudulent inducement, a plaintiff must demonstrate the same elements necessary to prove a traditional action for fraud, including: (1) a representation, or where there is a duty to disclose, concealment of fact; (2) which is material to the transaction; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent to mislead another into relying on it; (5) justifiable reliance; and (6) a resulting injury.

*Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp.3d 764, 775 (S.D. Ohio 2016), citing

*Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007). Plaintiff has pleaded each of these

elements and, therefore, his claim against Diaz based on conspiracy to commit fraud should not be dismissed.

Diaz represented to PICA's shareholders "that it was in their best interests, as well as PICA's best interests, for PICA to form a closer business relationship with SOS and for PICA to ultimately be sold to SOS." (Complaint ECF #2, ¶¶ 15, 43) Diaz also reassured PICA's CEO and Chief Strategy Officer, that "SOS would not use PICA's confidential information and trade secrets for any competitive or other improper purpose." (Id. ¶¶ 17, 43) These conversations occurred between October 2014, when Silverman first approached Diaz to discuss establishing a closer business relationship between the two companies with the purported goal of SOS purchasing PICA, and December 1, 2014, when the parties signed the NDA. (Id. ¶¶ 14, 18) These representations were material to PICA agreeing to the NDA and PICA relied on these representations when executing the NDA. (Id. ¶ 18) Diaz and his co-conspirators, SOS and Silverman, knew that these representations were untrue when they were made. (Id. ¶ 43) SOS and Silverman used Diaz to influence PICA's decision to sign the NDA and disclose its confidential information and trade secrets. In its complaint, Plaintiff alleges:

> 37.    Defendant Silverman tortiously induced PICA to sign the NDA and give up its confidential information and trade secrets to SOS, by falsely representing to PICA that SOS would keep secret, and not use for its own competitive business or other improper purposes, all confidential information and trade secrets disclosed by PICA to SOS, as part of SOS' purported due diligence investigation in connection with SOS' PICA Acquisition Process.

> 38.    Defendant Silverman made such materially false representations with the intent that they induce PICA to disclose PICA's confidential information and trade secrets to SOS, something PICA would never have done under any other circumstances.

> 39.    PICA, in reliance upon Silverman's materially false representations, acted to its detriment by disclosing PICA's confidential information and trade secrets to SOS.

40. Contrary to Silverman's material misrepresentation to PICA, SOS had no intention of maintaining PICA's confidential information and trade secrets, and not use it for SOS' own competitive business purposes, but instead intended to, and did, use PICA's confidential information and trade secrets to directly compete against PICA, for the purpose of stealing PICA's customers and business, means and methods.

41. As a direct and proximate result of the foregoing tortious actions, PICA has been damaged.

(Id. ¶¶ 37-41) The facts alleged establish the elements of a claim for fraudulent inducement and Defendant Diaz' role in the conspiracy to carry it out.

PICA was justified in relying upon the information conveyed by Diaz as Diaz was not only a 5% Shareholder, but also its Chief Operating Officer. (Id. ¶ 14) While he may not have had the control necessary to act on PICA's behalf without the concurrence of the other Shareholders or officers of PICA, he was certainly in a position to influence any decision that was made. It would be reasonable for PICA to believe that its COO was acting in its best interests and give substantial weight to his representations regarding signing the NDA and pursuing the sale of PICA to SOS.

Finally, Defendant Diaz argues that PICA's claim that Diaz engaged in a conspiracy to commit fraud cannot be based solely on a breach of a contractual duty. PICA did not enter into a contract with Diaz and Diaz had no contractual obligation to PICA under the NDA. Thus, there is also no breach of contract claim asserted against Diaz. PICA's claim against Diaz is premised on Diaz's fraudulent misrepresentations that induced PICA to sign the NDA even though Diaz knew that SOS did not intend to abide by it. Diaz's actions are independent from the contractual duty undertaken by SOS.

A tort claim "based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty separately from that created by the contract, that is, a duty owed even if no contract existed."

18

*R.G. Barry Corp. v. Olivet Int'l, Inc.*, No. 2:15-CV-00826, 2016 U.S. Dist. LEXIS 465, \*\*21-22 (S.D. Ohio Jan. 5, 2016) (Marbley, J.), quoting *Infocision Mgmt. Corp. v. Foundation for Moral Law Inc.*, No. 5:08-CV-1412, 2009 U.S. Dist. LEXIS 65867 (N.D. Ohio July 27, 2009) (citation omitted). Unlike *R.G. Barry*, in this case, Diaz's obligations to PICA do not fall within the terms of the contract. Instead, the claim against Diaz is based upon the independent duty to refrain from conduct to intentionally mislead PICA so that it would enter into the NDA.

Plaintiff acknowledges that Fed. R. Civ. P. 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity." However, "[t]he purpose of Rule 9(b) is to provide fair notice to the defendant so as to allow him [or her] to prepare an informed pleading responsive to the specific allegations of fraud." *Equal Justice Found. v. Deutsche Bank Trust Co. Ams.*, 412 F. Supp.2d 790, 797 (S.D. Ohio 2005), quoting *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999), citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988). While Plaintiff's complaint comports with this purpose, if the Court determines that additional facts need to be pled to satisfy Rule 9(b), Plaintiff urges the Court to grant it leave to file an amended complaint. As the court noted in *Equal Justice Found.*, "[i]n order to meet Rule 9(b)'s particularity requirement, 'federal courts must be liberal in allowing parties to amend their complaints.'" *Id.* at 798, quoting *Hayduk v. Lanna*, 775 F.2d 441, 445 (1st Cir. 1985).

### 3. Plaintiff can maintain a common law claim for breach of fiduciary duty.

In his motion, Defendant notes that Ohio Rev. Code §1701.641 did not come into effect until July 6, 2016, after Diaz was no longer employed by PICA. While Plaintiff's statutory claim may fail, if the Court finds that it is not preempted by OUTSA, the common law claim based on breach of fiduciary duty can nevertheless proceed.

    **4.**    **Plaintiff has stated a claim against Diaz based on conspiracy to tortiously interfere with business relationships.**

The statute of limitations applicable to a civil conspiracy claim is the statute of limitations governing the underlying claim on which it is based. *In re Fair Fin. Co.*, 834 F.3d 651, 679 (6th Cir. 2016), quoting *Davis v. Clark Cty. Bd. of Comm'rs*, 2013-Ohio-2758, 994 N.E.2d 905, 909 (2nd Dist.). The statute of limitations for a claim of tortious interference is four years. Ohio Rev. Code §2305.09(D). *See, Smith v. Nat'l W. Life*, 8th Dist. No. 104898, 2017-Ohio-4184, ¶ 11; *Kienow v. Cincinnati Children's Hosp. Med. Ctr.*1st Dist. Hamilton No. C-140720, 2015-Ohio-4396, ¶ 13. In this case, Defendant asks the Court to apply a shorter statute of limitations to Plaintiff's claim that Diaz conspired to tortiously interfere with PICA's business relationships, arguing that the one-year statute of limitations applicable to a defamation claim should be applied.

Plaintiff's conspiracy to tortiously interfere with business relationships is not based on a claim for defamation against Defendant Diaz. The tortious interference claim rests not only on Defendants' disparagement of PICA, but also on Plaintiff's claim that SOS took credit for PICA's work for Microsoft. (Complaint ECF #2, ¶¶ 24, 67) This is not a defamation claim. Until Plaintiff has had an opportunity to conduct discovery to determine what role Diaz played in the conspiracy, any ruling based on the statute of limitations would be premature.

**IV.**    **Conclusion**

For the foregoing reasons, Plaintiff urges the Court to dismiss the motion to dismiss in its entirety. In the alternative, Plaintiff respectfully requests that the Court grant PICA leave to amend its complaint to assert a claim for misappropriation of trade secrets based on OUTSA against Defendant Diaz.

Respectfully submitted,

/s/Daniel N. Abraham
Daniel N. Abraham (0023457)
David I. Shroyer (0024099)
**Colley Shroyer & Abraham Co., LPA**
536 South High Street
Columbus, Ohio 43215
T: (614) 228-6453
F: (614) 228-7122
Email: dabraham@csajustice.com
        dshroyer@csajustice.com
*Trial Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 10th day of September 2019, the foregoing was served upon all counsel of record through the Court's CM/ECF system.

 /s/Daniel N. Abraham
Daniel N. Abraham      (0023457)