# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **PROFESSIONAL INVESTIGATING AND CONSULTING AGENCY, INC.,** d/b/a **PICA CORPORATION,** | : : : : |
| **Plaintiff,** | : Case No. 2:19-cv-03304 : |
| v. | : Chief Judge Algenon L. Marbley : |
| **SOS SECURITY, LLC,** | : Magistrate Judge Elizabeth P. Deavers : : |
| **Defendant.** | : : |

## **OPINION & ORDER**

### I.     INTRODUCTION

This case arises out of allegations of corporate sabotage between Plaintiff Professional Investigating and Consulting Agency, Inc. ("PICA"), and Defendant SOS Security, LLC ("SOS"). The matter is now before the Court on Defendant's Motion for Summary Judgment (ECF No. 54) on Plaintiff's five remaining claims: breach of contract, misappropriation of trade secrets, tortious interference with business relationship, civil conspiracy, and quantum meruit. For the reasons set forth below, the Court **GRANTS** Defendant's motion on all counts.

### II.     BACKGROUND

#### A.     Factual Background

The relationship between PICA and SOS extends back many years. PICA is an Ohio corporation that provides security investigating and consulting ("C&I"), executive protection, and secure transport services. (*See* Compl. ¶ 2, ECF No. 2). Vincent Volpi is the CEO and founder of PICA; his brother, Vaughn Volpi, served as one of his partners and the Chief

1

Strategic Officer ("CSO") of PICA until 2017. (Deposition of Vincent Volpi ("Vincent Dep.") 9:10–12:2, ECF No. 72). On the other hand, Vincent Volpi characterizes SOS as a "contract security company," which he describes as focusing on providing "guards, gates, and guns" security services. (*Id.* 19:15–22). According to Volpi, SOS reached out to PICA to partner on providing two services outside of SOS's wheelhouse—C&I and executive protection—to their existing clients. (*See id.* 19:25–20:9). PICA agreed to collaborate, and began providing those services to SOS's clients, effectively as an SOS sub-contractor, in 2014.

Around October 2014, SOS initiated discussions about potentially acquiring PICA. (Deposition of Rudy Diaz ("Diaz Dep.") 53:23–54:13, ECF No. 82). The idea was first mentioned by Eddie Silverman, the then-CEO of SOS, to Rudolfo ("Rudy") Diaz, who was a minority shareholder and then-COO of PICA. (*Id.*). Diaz passed on the message to the Volpis. (*Id.* 54:22–55:4). From Diaz's perspective, SOS appeared to have a strong hold over the security services market in the Northeast and New York, and was hoping to diversity its services offerings, especially in C&I. (*Id.* 55:5–57:7). Silverman disputes that there were any PICA services that SOS was not already providing to its clients, estimating that 20% of SOS's work was already in investigations by 2015. Instead, he asserts that SOS was interested in purchasing PICA because he felt that Vincent Volpi had a strong background in Latin America and could augment SOS's services in that region, which were primarily being conducted through a partner company called EVIK Security. (Deposition of Eddie Silverman ("Silverman Dep.") 18:6–21:11, 173:22–174:1, ECF No. 65). Existing SOS work in Latin America included a security contract with the State Department, for the provision of patrol, investigations, and executive protection services at the US embassy and consulates in Brazil, which SOS had held since 2009 or 2010. (*Id.* 25:11–18).

Negotiations between PICA and SOS progressed rapidly and by December 1, 2014, the parties had signed a Confidentiality and Non-Disclosure Agreement ("NDA"), to protect PICA's confidential information that it was sharing with SOS as part of the due diligence process. (*See* Vincent Dep. 16:18–17:6, ECF No. 72; ECF No. 2-1).  Between December 2014 and April 2015, PICA alleges that SOS requested, and PICA provided, information about PICA's customers, vendors, expertise related to services, sales, and marketing, pricing model (including rates), overhead expenses, financial statements, and margins for each client for the preceding five years.[1] (*See* Vincent Dep. 27:13–28:14, ECF No. 72; *see, e.g.*, ECF Nos. 68-1, -2).  Silverman, however, disputes that SOS acquired any information about PICA's partners and vendors, pricing and cost models, or means of delivery of C&I or executive protection services; he maintains that the only information SOS learned from the disclosure process was about PICA's finances.  (*See* Silverman Dep. 109:17–110:9, ECF No. 65).

On May 1, 2015, Diaz announced that he planned to resign from his position at PICA, effective May 31.  (Diaz Dep. 153:8–16, ECF No. 82).  Diaz does not believe that the acquisition of PICA by SOS was certain at this point; in fact, he claims that he resigned in part because he was worried that Vincent Volpi was approaching the acquisition process in the wrong way.  (*See id.* 81:5–82:12).  SOS had submitted multiple letters of intent to PICA in April 2015, with the second letter requesting a response by April 30, but PICA had not accepted the terms of the

---

[1] But the portion of Vincent Volpi's deposition that relates to information-sharing by PICA with SOS only states: "So I will be somewhat more cautious, unless you are in a due diligence situation with us at the same time.  In which case, I am going to be completely and totally transparent with you, because I'm telling you what the value added is that we offer providing these services.  I give you the trade secrets, which is military police are the best.  Here is how I get them, here is what I pay them, here is the margin that's involved in that.  Here is what we charge the client.  Here is what it breaks down for taxes in Brazil. . . . I let SOS see behind the curtain while we were doing things together."  (Vincent Dep. 27:24–28:14, ECF No. 72).  Vince later clarified that it was his brother, Vaughn, who provided the information to SOS upon request.  (*See id.* 127:6–11).  In Vaughn Volpi's deposition, there is no testimony about the sharing of information about military police, margins, or legal or tax personnel in Brazil; Vaugh did testify that he felt SOS occasionally overstepped in its requests for information from PICA but did not specify in what way.  (Vaughn Dep. 30:12–24, ECF No. 70).

3

second letter. (*See* Vincent Dep. 71:21–74:23, ECF No. 72). By contrast, Silverman claims that, at the time SOS found out Diaz was leaving PICA, SOS had already decided not to go forward with the acquisition of PICA. (*See* Silverman Dep. 94:7–20, ECF No. 65). While it is unclear when SOS or Silverman learned of the personnel changes at PICA, internal SOS emails show that Ken Fisher, the then-CFO of SOS, and Silverman were still discussing acquisition details as late as May 6, 2015. (*See id.* 100:17–101:9). One email asks what benefits SOS would gain from acquiring PICA was Diaz is no longer employed there. (*Id.*).

After Silverman officially put the acquisition on hold in late May 2015, PICA and SOS continued to work together on projects in Mexico and Latin America through the end of 2015 and into 2016. (*See* Vincent Dep. 108:4–9, ECF No. 72). Two projects are highlighted in PICA's briefing. First, the parties collaborated on some work for clients SOS was representing during the 2016 Olympics; Vincent Volpi recalls preparing a plan, in the form of a spreadsheet, for services for SOS clients attending the Olympics. (*Id.* 152:12–153:19; *see id.* 108:13–16). But though Volpi made the plan and was told by SOS that PICA would be included in the project itself, PICA was ultimately left out of SOS's contract. (*See id.* 154:17–25). Additionally, Olavo Sant'Anna, who had headed PICA's Brazilian subsidiary's office, started acting insubordinately around May and June 2015, and eventually resigned at the end of the year—only to then join SOS and allegedly solicit PICA clients and personnel. (*Id.* 21:3–9*,* 34:4–15, 35:12–15).

One of those clients was Microsoft, for whom PICA and SOS had worked together on a project in Brazil involving the recovery of stolen prototype Xboxes. Together, they were able to recover almost all of the inventory and caught ten of the culprits. (*Id.* 111:15–112:1). But despite the collaborative success, SOS disparaged PICA to Microsoft representatives and claimed that PICA was overbilling Microsoft. Since then, Microsoft has never contracted with

PICA for further security services even though Microsoft had previously had a long-standing business relationship with PICA for many years. (*See id.* 113:10–20; Deposition of Vaughn Volpi ("Vaughn Dep.") 41:15–47:5, ECF No. 70). Vaughn Volpi felt that SOS, through Andrew Silverman, Eddie's son, had provided Microsoft with inaccuracies about the scope of the project, the timing, and PICA's efforts. On the few occasions PICA had the opportunity to clarify any of SOS's misstatements with Microsoft, Microsoft expressed appreciation for PICA's work. (Vaughn Dep. 47:9–48:2, ECF No. 70). That was not enough, however, to salvage the relationship.

In July 2017, Diaz joined SOS, which has since been acquired by Allied Universal. (Diaz Dep. 203:14–24, ECF No. 82; *see* Vincent Dep. 18:16–17, ECF No. 72). After Diaz left PICA in May 2015, he first joined GlobalFoundries but stayed in contact with various SOS personnel, grabbing dinner with Eddie Silverman on May 19, 2022, and reaching out to both Andrew Silverman and Ken Fisher that summer. (*See* Pl.'s Ex. 5, ECF No. 82-4; Pl.'s Ex. 7, ECF No. 82-6). Ultimately, PICA alleges that Diaz's efforts in facilitating the acquisition discussions between Silverman and the Volpis were a ruse to hide a conspiracy concocted by him and Silverman to steal PICA customers and trade secrets, as apparently evidenced by his decision to join SOS once his two-year non-compete with PICA expired. (*See* Pl.'s Resp. in Opp'n at 5, ECF No. 66). That allegation, among others, gave rise to this suit.

### B. Procedural Background

Plaintiff PICA filed suit in the Franklin County Court of Common Pleas on June 27, 2019, against SOS, Rodolfo Diaz, and Edward Silverman. (Ex. A, ECF No. 1-2). Defendants removed the case to this Court on July 30, 2019, based on diversity of citizenship pursuant to 28 U.S.C. § 1332(c)(1). (*See* Notice of Removal ¶ 5, ECF No. 1). The initial Complaint alleged ten

counts, five of which were dismissed by this Court on January 14, 2020. (*See* Op. & Order, ECF No. 22). That Order also dismissed Defendants Diaz and Silverman from the case, leaving five claims against SOS, the sole remaining defendant: (1) breach of contract (Count I); (2) trade secret misappropriation in violation of the Ohio Uniform Trade Secret Act ("OUTSA"), Ohio Rev. Code § 1333.61–.69 (Count VI); (3) tortious interference (Count VII); (4) conspiracy to commit tortious interference (Count VIII); and (5) quantum meruit (Count X). On August 11, 2022, SOS filed its Motion for Summary Judgment (ECF No. 54), which is now ripe.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The Court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in the non-movant's favor. *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)). Summary judgment is inappropriate, however, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Evidence that is "merely colorable" or "not significantly probative" is not enough to defeat a motion for summary judgment, *id.* at 249–50, nor is "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position" sufficient. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

The initial burden rests upon the movant to present the Court with law and argument in support of its motion, and to identify the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). Where the nonmoving party bears the ultimate burden of proof, "the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there remains a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (noting that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

## IV. LAW & ANALYSIS

There are five claims at issue in SOS's Motion for Summary Judgment. As PICA concedes that the fourth of these claims—conspiracy to interfere tortiously with business relationships—is subject to dismissal, the Court addresses the four remaining claims in the order presented by the parties: (1) trade secret misappropriation; (2) breach of contract; (3) tortious interference; and (4) quantum meruit. (*See* Pl.'s Resp. in Opp'n at 17 n.4, ECF No. 66).

### A. Trade Secret Misappropriation

The Ohio Uniform Trade Secrets Act establishes a cause of action for the misappropriation of trade secrets. "Trade secrets" is defined by the statute as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic

7

value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ohio Rev. Code § 1333.61(D). Misappropriation can take various forms, including the acquisition of a trade secret through improper means or the disclosure or use of trade secrets by someone who acquired the information through improper means or who understood her duty to keep the information confidential. *Id.* § 1333.61(B). The canonical formulation of an OUTSA claim requires the plaintiff to show three elements: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret," *Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (citing *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam)), though the third element has been clarified based on the language of the OUTSA to incorporate not only the unauthorized use of a trade secret, but also the acquisition of trade secrets by improper means. *See Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 457 n.6 (6th Cir. 2013) (citing Restatement (Third) of Unfair Competition § 40 cmt. b (Am. L. Inst. 1995); *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000)).

SOS argues that it warrants summary judgment on PICA's trade secret misappropriation claim because there is insufficient evidence that PICA's business practices are not generally known or ascertainable by proper means, and thus they are not trade secrets. (Def.'s Mot. for Summ. J. at 54 at 5, ECF No. 54). The Ohio Supreme Court has adopted a six-factor test for determining certain information is a trade secret, based on:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in

8

> obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997) (citations omitted). PICA's alleged trade secrets include its business models, client lists, pricing structure (i.e., the rates it charges clients and the rates it pays its contractors), executive protection know-how, including its local connections and personnel, and financial information. (*See* Pl.'s Resp. in Opp'n at 9–11, ECF No. 66). These fall within the statutory definition for the types of information that can constitute trade secrets. *See* Ohio Rev. Code § 1333.61(D) (including "any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information" among the types of information that can be trade secret). Moreover, testimony from both Vincent Volpi and Eddie Silverman establish that PICA's asserted trade secrets had value, were subject to efforts to keep them confidential, and were developed over many years. *See State ex rel. The Plain Dealer*, 687 N.E.2d at 672. Silverman acknowledged, for example, that security companies want to keep information like payment rates, pricing structures, and financial information confidential, and that PICA took steps to keep the information that it provided to SOS confidential. (*See* Silverman Dep. 125:5–8, 127:13–18, 162:22–163:25, ECF No. 65). SOS has not cited to or proffered any evidence suggesting otherwise.

SOS also argues that PICA has failed to demonstrate that it "misappropriated" any of PICA's trade secrets. The core of PICA's claim is that, during the due diligence process, it disclosed trade secrets to SOS subject to the NDA—services in which PICA claims SOS lacked expertise or experience (specifically, executive protection and C&I services). But then, after the

partnership between SOS and PICA ended, SOS improperly leveraged that confidential information to continue providing its clients with the executive protection and C&I services in Latin America that it previously could not. (*See* Pl.'s Resp. in Opp'n at 11–12, ECF No. 66). Thus, the claim is one of unauthorized use of trade secrets, rather than improper acquisition.[2] SOS asserts that PICA's allegations of improper use rest entirely on an assumption that "SOS's performance of certain tasks following its relationship with PICA could have been done only through SOS co-opting PICA's trade secrets." (Def.'s Mot. for Summ. J. at 6, ECF No. 54). That assumption, SOS suggests, is mere speculation.

The Sixth Circuit has recognized that "courts may properly consider circumstantial evidence" of claims of trade secret misappropriation "because corporations rarely keep direct evidence of their [improper] use ready for another party to discover." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600, 601 (6th Cir. 2005) (collecting cases). Where a party alleges the misappropriation of a confidential design, for example, "[s]ufficient circumstantial evidence of use . . . must demonstrate that (1) the misappropriating party had access to the secret and (2) the secret and the defendant's design share similar features." *Id.* (citing *Leggett & Platt, Inc. v. Hickory Springs Mfg.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002); *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976)). Although this case does not involve confidential product designs, a similar principle is at play. To demonstrate that SOS misappropriated its trade secrets, PICA must show that SOS improperly used those trade secrets. One way to do so is by direct evidence, which PICA does not have; despite Vincent Volpi's repeated assertions about

---

[2] With respect to the acquisition of PICA trade secrets, SOS notes that it received PICA's financial information and business plans as part of the due diligence process. Although acquisition through a sham due diligence process could potentially comprise improper acquisition, PICA has not made that argument in its briefing and the evidence does not appear to support such an argument, since there is no indication that the due diligence process was a sham except for Vincent Volpi's unsupported speculation to that effect.

"documentary evidence" of SOS's use of trade secrets to compete illegally with PICA, none of that evidence, if it exists, has been presented in the record. (*See, e.g.*, Vincent Dep. 21:21–22:3, ECF No. 72). In the absence of direct evidence, PICA could also show misappropriation by circumstantial inference—that SOS had access to PICA's trade secrets and that SOS provided services with similar features as PICA's. One indication would be if SOS's services had key characteristics or features that were disclosed in the trade secrets; such similarities would permit an inference that SOS had actually used PICA's information, in the same way that a claim of misappropriation of product design trade secrets requires the plaintiff to show that the defendant's design shares "salient features" with the secret. *See Stratienko*, 429 F.3d at 601–02.

There is some dispute as to the extent of SOS's access to PICA trade secrets. While SOS acknowledges that it received PICA's financial documents during the due diligence process, Silverman refutes that Fisher, his CFO at SOS, ever received or asked for technical information about how PICA provides its services. On the other hand, PICA relies on vague testimony from Vincent Volpi for the proposition that it shared more than just financial documents. Neither party has adduced documentary evidence or third-party testimony in support of its position. *See Foreman v. Five Star Food Serv., Inc.*, 950 F. Supp. 2d 958, 976 (M.D. Tenn. 2013) (noting that a dispute between opposing "self-serving testimony" can create a genuine issue of material fact).

As to the question of whether SOS used any trade secrets that it allegedly acquired, PICA's allegations are all couched in general terms that fail to identify specific similarities between the services that SOS provided and the know-how that PICA disclosed. (*See, e.g.*, Vincent Dep. 18:17–19, ECF No. 72). Central to PICA's success in Brazil, according to Vincent Volpi, was the expertise and understanding of nuances it had cultivated over a decade working there. PICA knew the best military police, legal, and tax personnel to work with and had

11

knowledge of local labor laws and the right way to run a successful security services company, whereas many of PICA's competitors failed or disappointed clients for lack of knowledge of such nuances. (*Id.* 28:5–30:23). But PICA has not presented any evidence that the services SOS provided in Brazil after the partnership ended shared salient features with any aspect of the above-mentioned information. It has not shown, for example, that SOS used the same pricing or business models, used the same service techniques, or instituted similar internal controls.

The only similarity PICA has identified is the employment of Sant'Anna, who formerly ran PICA's Brazil office before being hired by SOS. But this similarity alone is not enough to give rise to an inference of misappropriation. PICA asserts that SOS contacted Sant'Anna while he was still working for PICA, "induced" him to leave PICA, and used him to poach certain PICA clients,[3] including Bain and Yves St. Laurent.[4] At no point does PICA assert that the fact of its employment of Sant'Anna constituted a trade secret; after all, it was not a secret that he worked for PICA's Brazilian entity. Instead, the personnel trade secrets consist of information about which military police to work with, or which lawyers, accountants, and tax people know how to do things correctly. (*See* Vincent Dep. 29:5–8, 30:10–20, ECF No. 72). PICA has not provided any indication, however, that when SOS continued to provide services in Brazil allegedly in reliance on PICA's trade secret information, it used the same lawyers, accountants, tax people, or other personnel that had been cultivated by PICA through its experience.

---

[3] Despite these allegations, PICA has not brought legal claims against SOS for interfering with either Sant'Anna's employment contract with PICA or for interfering (through Sant'Anna) with PICA's executive protection services contracts with Yves Saint Laurent or Bain.
[4] Vincent Volpi states that both PICA and SOS had previously worked with Bain and Yves Saint Laurent prior to PICA and SOS's partnership. (Vincent Dep. 56:2–22, ECF No. 72).

In short, PICA's trade secret misappropriation is reliant entirely on general allegations that that SOS "continued to offer the services that [PICA was] offering without [PICA],"[5] but is unsupported by any evidence in the record that the services SOS provided in Brazil shared any salient features with the confidential trade secret information that PICA disclosed, thus precluding an inference of misappropriation. (*Id.* 33:18–19). Accordingly, as there is no genuine dispute of material fact as to whether SOS misappropriated PICA's trade secrets, the Court **GRANTS** SOS's motion for summary judgment on this claim.

### B. Breach of Contract

PICA also asserts a breach of contract claim against SOS, alleging that SOS's use of PICA's trade secrets violated the mutual NDA that the parties signed during the due diligence process. To state a claim for breach of contract under Ohio law, PICA must show: "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat'l Ass'n*, 569 F. App'x 438, 442 (6th Cir. 2014) (quoting *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)). In asking for summary judgment on this claim, SOS hangs its hat on the third element, arguing that the record lacks evidence that SOS used PICA's confidential information, and thus lacks evidence of a breach of the NDA. (*See* Def.'s Mot. for Summ. J. at 7, ECF No. 54).

---

[5] SOS has also presented a legitimate explanation for how it continued to operate in Brazil. Silverman explains that it had been providing executive protection and C&I services, the two areas that PICA claims SOS was missing, for many years prior to its partnership with PICA and had numerous other subcontractors that it worked with in Brazil in addition to PICA. (*See* Silverman Dep. 18:6–19:2, 29:2–17, 44:11–45:7, ECF No. 65). This includes, for example, the US embassy contract. In other words, Silverman suggests that SOS's ability to continue providing those services is due not to misappropriation but to its preexisting know-how and corporate relationships. PICA has not presented any evidence refuting this.

As discussed in Section IV.A, *supra*, PICA's evidence that SOS has actually used its confidential information amounts to little more than generalized allegations. It has not presented evidence, direct or circumstantial, that any services provided by SOS in Latin America after the break-up between SOS and PICA carried the hallmarks of PICA's business model or technical expertise. Nor has it presented evidence that SOS copied PICA's financial models or its prospective clients; in fact, PICA's allegations that SOS poached Microsoft, Bain, and Yves Saint Laurent as clients are undermined by the fact that these corporations had already been clients of SOS before PICA and SOS partnered together.[6] Moreover, the allegations rely entirely on Vincent Volpi's testimony without any supporting documentary evidence or corroborating testimony.

Whether self-serving testimony alone suffices to create a genuine dispute of material fact is a fact-specific inquiry as to the plausibility of the allegations, rather than the credibility of the witness. *See Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848, 878 (M.D. Tenn. 2021) (noting that, while "unsupported and self-serving statements can be credible under certain circumstances, [] the Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported by additional evidence" (internal quotation marks and citation omitted)); *see also Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 419 (6th Cir. 2008). But here, the facts suggest that the testimony alone is not enough. This is, in part, because Vincent Volpi's conclusion that SOS used PICA trade secrets is not even supported by the facts about which he testified. When asked, for example, what businesses PICA would have contracts with but for SOS's actions, Volpi could

---

[6] In his deposition, Vincent Volpi asserts that his brother, Vaughn Volpi, is better placed to discuss PICA's relationships with Bain and Yves Saint Laurent. (Vincent Dep. 37:14–20, 56:15–22, ECF No. 72). But nowhere in Vaughn Volpi's deposition does he discuss Bain or Yves Saint Laurent. (*See generally* Vaughn Dep., ECF No. 70).

14

not name any but simply claimed that "[t]hat number could be somewhat unlimited." (Vincent Dep. 62:21–63:19, ECF No. 72). Elsewhere, when asked about customers that PICA had lost because of SOS's improper conduct, Volpi listed Bain, Microsoft, and Yves Saint Laurent, but acknowledged that these were clients that SOS had brought to PICA, not PICA's clients that SOS poached. (*Id.* 56:2–16). In summary, while Volpi concludes in his testimony that SOS used PICA trade secrets, he provides no testimony, except for his "suspicions," of how SOS used the trade secret or to what ends.

Without evidence that SOS made use of PICA's confidential documents, there is no genuine dispute as to whether SOS breached its NDA with PICA. Accordingly, the Court **GRANTS** SOS's motion for summary judgment on this claim.

C. **Tortious Interference**

PICA alleges that SOS, by disparaging PICA's work to Microsoft and manufacturing a dispute about billing practices, tortiously interfered with PICA's relationship with Microsoft. A claim based on tortious interference with a business relationship has five elements under Ohio law: "(1) the existence of a contract and/or business relationship; (2) the tortfeasor's knowledge thereof; (3) the tortfeasor's intentional interference causing a breach or termination of the relationship; (4) lack of justification; and (5) damages." *AtriCure, Inc. v. Meng*, 12 F.4th 516, 538–39 (6th Cir. 2021) (Guy, J., dissenting) (quoting *Harris v. City of St. Clairsville*, 330 F. App'x 68, 79 (6th Cir. 2008)); *see also Fred Siegel Co., LPA v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).

SOS argues that PICA cannot show the third element, because there is no evidence that alleged interference by SOS was the reason (or even *a* reason) why PICA no longer has a business relationship with Microsoft. (*See* Def.'s Mot. for Summ. J. at 8, ECF No. 54). In

15

particular, SOS notes that the third element requires a plaintiff "***show that the defendant's wrongful interference caused the benefit not to materialize***," which "generally means showing that the plaintiff more likely than not would have realized the benefit but for the defendant's wrongful act." (*Id.* at 9) (emphasis in original) (quoting Restatement (Third) of Torts: Liability for Economic Harm § 18 cmt. d (Am. L. Inst. 2020)). And the only evidence that PICA has, according to SOS, is its "own, subjective, unsupported belief," which is insufficient to meet the burden of proof. (*Id.*) (citing *Costaras v. Dunnerstick*, No. 04CA008453, 2004 WL 2674576 (Ohio Ct. App. Nov. 24, 2004)).

PICA's sole argument in rebuttal is that it "maintains that the misrepresentations and disparaging comments related to PICA that were made by SOS to Microsoft was the reason Microsoft no longer uses PICA." (Pl.'s Resp. in Opp'n at 17, ECF No. 66) (citing Vincent Dep. 114:5–10, ECF No. 72). But PICA provides no evidence corroborating this statement. There is nothing in the record, for example, showing the thought process of any decision-makers at Microsoft or any impending contracts of which PICA was deprived. Nor does it appear the case that PICA's preexisting relationship with Microsoft was so long-standing and so robust that it had a clear expectation of continued business barring any misconduct by SOS (especially where the only previous work with Microsoft that is specifically identified and established in the record was a joint endeavor by SOS and PICA).[7] *See also Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) (noting that "suspicions" are not enough to support a claim for tortious interference).

---

[7] Vincent Volpi alleges that PICA had previously worked with Microsoft prior to its partnership with SOS but has not provided any exhibits to that effect.

Without any evidence that SOS's actions caused a "breach or termination" in the relationship between PICA and Microsoft, there is no genuine dispute of fact with respect to PICA's tortious interference with business relationship claim. Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to that claim.

### D. Quantum Meruit

Finally, PICA asserts a quantum meruit claim based on work that Vincent Volpi allegedly did for SOS in South America in preparation for the 2016 Rio Olympics, for which PICA claims he was not paid. A claim of quantum generally arises "when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered." *Akron Bar Ass'n v. Catanzarite*, 119 Ohio St.3d 313, 2008-Ohio-4063, ¶ 16, 893 N.E.2d 835, 840 n.1 (Ohio 2008) (quoting *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989)). The claim requires a plaintiff to demonstrate the following elements:

> (1) Valuable services were rendered or materials furnished; (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services was expecting to be paid by the person sought to be charged.

*Waite, Schneider, Bayless & Chesley Co., LPA v. Davis*, 99 F. Supp. 3d 791, 807–08 (S.D. Ohio 2015) (quoting *Sonkin & Melena Co., LPA v. Zaransky*, 614 N.E.2d 807, 811–12 (Ohio Ct. App. 1992)).

Here, SOS suggests that PICA is unable to show that its work product—specifically, the spreadsheet of security operations and logistics for Liberty Mutual during the Rio Olympics—was actually "used and enjoyed" by SOS. In the alternative, SOS argues that PICA cannot show that the spreadsheet was created under circumstances where SOS would reasonably know that

17

PICA expected to be paid because the spreadsheet may instead have been prepared to induce SOS to purchase PICA.  (*See* Def.'s Mot. for Summ. J. at 13, ECF No. 54).  In response, PICA simply asserts that "PICA provided [its] services and performed the work for SOS with the expectation that it would be compensated for the services and work when SOS closed on the acquisition."  (Pl.'s Resp. in Opp'n at 19, ECF No. 66).  Here, too, PICA has provided no evidence of its allegations, despite carrying the ultimate burden of proof: PICA has not provided emails between PICA and SOS discussing the work to be prepared and the rate to be charged, or unpaid invoices demonstrating PICA's expectation of payment and SOS's failure to fulfill that expectation, among other examples of possible evidence.  *See also Scadden v. Werner*, 677 F. App'x 996, 1000 (6th Cir. 2017).

The lack of such evidence, and PICA's bare reliance on unsupported assertions, leads the Court to conclude that there is no genuine dispute of material fact on the third element of the quantum meruit claim.  Accordingly, the Court **GRANTS** SOS's motion for summary judgment as to that claim.

## V.    CONCLUSION

For the reasons stated more fully above, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 54).  This case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  March 22, 2023**